## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **TYRONE MOORE,** | : | **CIVIL ACTION NO. 1:05-CV-0828** |
| | : | |
| **Petitioner** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **JEFFREY BEARD, Commissioner,** | : | |
| **Pennsylvania Department of** | : | |
| **Corrections; DAVID DIGUGLIELMO,** | : | |
| **Superintendent of the State** | : | |
| **Correctional Institution at** | : | |
| **Graterford,** | : | |
| | : | |
| **Respondents** | : | |

## MEMORANDUM

The instant case demonstrates the myriad problems inherent in delayed analysis of ineffective assistance of counsel claims.  Following the retrial and conviction of petitioner Tyrone Moore ("Moore") in the Court of Common Pleas of Luzerne County, Pennsylvania, in September 1983, the exhaustion of state court direct appeals and post-conviction collateral review proceedings consumed more than  two decades.  During that time, memories faded, witnesses recanted crucial trial testimony, and key witnesses passed away.  Add nine years that the matter has been pending in federal court and the problems become intractable.  Defense counsel's collective recollection of trial strategy is woefully inadequate,  and the court thus is unable to reconstruct, beyond pure speculation, any logical rationale for many of defense counsel's decisions during Moore's retrial.  Hence,  the court is

compelled to grant the petition for a writ of habeas corpus filed by Moore on April 27, 2005, pursuant to 28 U.S.C. § 2254.

Initially, on December 11, 2007, the court denied Moore's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Doc. 35). On January 9, 2012, the United States Court of Appeals for the Third Circuit issued a judgment affirming in part, reversing in part, and remanding the matter to conduct an evidentiary hearing on the following issues: (1) whether trial counsel was ineffective for failing to (a) impeach Juanita Lancaster ("Lancaster") with prior inconsistent statements, (b) present co-defendant Anthony Brad Jones ("Jones") as a defense witness to contradict the Commonwealth's case, (c) impeach co-defendant Ricardo Scott ("Scott"), and (d) investigate Sarah Lancaster as a potential witness; and (2) whether the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), based on Moore's allegations that the prosecutors and FBI agents pressured two key witnesses (Scott and Lancaster) into giving perjured testimony implicating him in the robbery, and intimidated Willie Rush, an alibi witness, from testifying. Moore v. Sec'y Pa. Dep't of Corr., 457 F. App'x 170, 182 (3d Cir. 2012).[1]

Following completion of discovery, the matter proceeded to an evidentiary

---

[1] The Third Circuit issued its mandate on February 13, 2012, but recalled it on February 21, 2012. (Docs. 39-40). The Circuit reissued its mandate on March 27, 2012. (Doc. 41).

hearing on May 1 and May 2, 2014.[2]  Post-hearing memoranda (Docs. 106-07) and a supplemental memorandum (Doc. 108) have been filed, and the matter is now ripe for disposition.  In light of the hearing testimony and documentary evidence presented, along with the court's credibility determinations, the court concludes that Moore is entitled to relief on the grounds that counsel was indeed ineffective in failing to present Jones as a defense witness to contradict the Commonwealth's case, and in failing to impeach Scott.  Because granting relief on these claims necessitates *vacatur* of Moore's conviction, the court need not address the other remanded claims.

## I.    Factual Background

"On the evening of October 1, 1982, an armed robbery at the veterinary office of Dr. Joseph Lopotofsky at Forty-Fort Animal Hospital in Luzerne County, Pennsylvania, ('the Forty-Fort robbery') resulted in the death of Mr. Nicholas Romanchick.  Two men had entered the clinic where the doctor was examining Mr. and Ms. Romanchick's cat.  As the robbers were tying up the doctor, the doctor's assistant, and the Romanchicks, one of the robbers shot Mr. Romanchick in the back.  The robbers fled, taking Ms. Romanchick's purse with them.  Mr.

---

[2] The court notes that the delay between the Third Circuit's remand in March 2012 and the court's evidentiary hearing in May 2014 is largely attributable to the parties' various motions for extension of deadlines, including five (5) motions to extend discovery and other deadlines filed by Moore's counsel.  (See Docs. 53, 56, 58, 80, 89).

Romanchick died thirteen days later from the gunshot wound." Moore, 457 F. App'x at 173.

On January 7, 1983, Moore was arrested for Mr. Romanchick's murder. Id. Prosecutors initially tried Moore in the Court of Common Pleas of Luzerne County, Pennsylvania, in May 1983, on charges of first degree murder, criminal conspiracy, robbery, theft by unlawful taking or disposition, and recklessly endangering another person. Two court-appointed attorneys, Patrick Flannery ("Attorney Flannery") and Joseph Yeager ("Attorney Yeager"), represented Moore. The initial trial ended in a mistrial because photographs used during a suppression hearing, but not introduced into evidence, were inadvertently given to the jury when it commenced deliberations. Commonwealth v. Moore, 633 A.2d 1119, 1122 n. 2 (Pa. 1993).

The same court-appointed attorneys, Flannery and Yeager, represented Moore during his retrial in September 1983. The second trial resulted in Moore's conviction on all charges, including first degree murder. The Commonwealth identified Moore as the shooter based on testimony from Ms. Romanchick, Lancaster, and co-defendant Scott, but did not present any physical or forensic evidence. See Moore, 457 F. App'x at 174. The core of Moore's defense at the second trial was that he was not at the Forty Fort Animal Hospital in Wyoming, Pennsylvania, on October 1, 1982, but rather was in Philadelphia, Pennsylvania. (Evidentiary Hrg. Tr. ("Hrg. Tr.") 14:1-24, May 1-2, 2014). To that end, the defense filed a timely notice of alibi defense and called both Moore and Kenneth McGoy

4

("McGoy") as witnesses.  (Pet'r's Evidentiary Hrg. Ex. ("Petr.'s Hrg. Ex.") 1).  At

Moore's insistence, co-defendant Jones was identified as a material witness by

defense counsel and brought to the courthouse to testify on Moore's behalf.[3]  (Hrg.

Tr. 58:7-59:13; Petr.'s Hrg. Exs. 14, 17).  Counsel had a brief conversation with

Jones and, despite his offer to testify for Moore, counsel decided not to call him as a

witness.  (Hrg. Tr. 59:24-61:2).  On rebuttal, the Commonwealth introduced Robert

Brunson ("Brunson") to further establish that Moore was in the Wilkes-Barre area

on October 1, 1982.

**A.   The Commonwealth's Case**

   1.   <u>Ricardo Scott</u>

The Commonwealth's key witness at trial was Scott, whose testimony

inculpated Moore in the crime from inception to completion.  He "confessed to the

FBI that he, Moore, and Jones had driven to the Forty Fort Animal Hospital to rob

Dr. Lopotofsky, and that Moore had shot Mr. Romanchick."  <u>Moore</u>, 457 F. App'x at

173.  At trial, his direct examination opened with the following candid discussion of

his motive for testifying:

   Q.   Mr. Scott, we have talked before, have we not?

   A.   Yes, we[] have.

---

[3] According to the petition for writ of habeas corpus filed by defense counsel, at the time, Jones was incarcerated at the United States Penitentiary at Lewisburg, Pennsylvania.  (Petr.'s Hrg. Ex. 14).

Q.     In fact, you have talked with myself and Trooper
       Taylor, Chief Gilligan[,] and Joe Carmody from our
       office, is that correct?

A.     That's correct.

Q.     And would it be fair to say, Mr. Scott, that your
       presence today is only as a result of an agreement
       that was entered into between you, your attorney,
       Barbara Kauffman of Philadelphia, this office and
       the F.B.I.?

A.     Yes, it would be fair to say.

Q.     I want to show you what's been marked for
       identification purposes as Commonwealth Exhibit
       No. 29, can you identify what that document is, Mr.
       Scott?

A.     It's an agreement between the State and myself.

Q.     And who is the letter addressed to?

A.     My attorney, Barbara Kauffman, and me, Ricardo
       Scott.

Q.     Is this an agreement that we entered into, Mr.
       Scott?

A.     Yes, it is.

Q.     Is this the agreement that the F.B.I. entered into?

A.     Yes it is.

                              * * *

Q.     Mr. Scott, what is the only way you can get in
       trouble with this plea agreement?

A.     By not testifying truthfully.

6

(Trial Transcript ("Trial Tr.") 428:23-429:21; 432:25-433:2, Sept. 12, 1983 - Sept. 20,

1983).  The prosecution read the following pertinent portions of the plea agreement

into the record and introduced them into evidence:

> (1)   Scott was arrested on "an open charge of criminal homicide and related charges, robbery and conspiracy, arising out of the events occurring in Wyoming Borough, Luzerne County, Pennsylvania, on October 1, 1982, and the days subsequent to the shooting which led to the eventual death of Nicholas Romanchick on October 13, 1982." (Id. 430:10-19).

> (2)   Scott was required to provide the prosecutors, law enforcement, and other representatives of the Luzerne County District Attorney's Office with a truthful and complete statement as to the related events preceding, during, and subsequent to the October 1, 1982 shooting. (Id. 430:21-431:3).

> (3)   He was to plead guilty to the offense of third degree murder and receive a sentence of "five to ten years . . . concurrent to any federal sentence imposed on him by the federal jurisdiction."  (Id. 431:9-19).

> (4)   The sentence was to be "if . . . possible, served in a federal institution, but in no event at a cost to the Commonwealth of Pennsylvania or any of its political subdivisions.  This presuppose[d] an earlier federal sentence being imposed." (Id. 431:15-21).

> (5)   Scott was required to continue to cooperate with federal authorities. (Id. 432:7-8).

The plea agreement, which was approved by law enforcement officials and the

Luzerne County District Attorney's Office and entered into at the request of the

federal authorities, was moved into evidence without any objection from defense

counsel.  (Id. 432:13-20).  Defense counsel did not broach the issue of Scott's plea

agreement in any manner on cross examination.  (Id. 459:14-487:22).

Scott testified that "a week or two" before October 1, 1982, he met Moore through Jones.  (Id. 460:11-22).  However, Jones introduced him as "Buzzy," not as Tyrone Moore.  (Id. 460:24-461:3).  Scott did not know him as "Karim" and did not learn that "Buzzy" was Tyrone Moore until he spoke with the FBI.  (Id. 461:1-14).

According to Scott, on October 1, 1982, Scott, Jones, and Moore traveled in Moore's car, either a black or blue Oldsmobile, from Philadelphia, Pennsylvania, to Wilkes-Barre, Pennsylvania, for "no specific purpose."  (Id. 435:8-437:25).  While driving around, a "plan was developed . . . to go in and rob this doctor" based upon Jones' representation that Dr. Lopotofsky ("the doctor"), a veterinarian at the Forty Fort Animal Hospital, was a "fence" who owed him $3,000.  (Id. 438:1-18).  According to the plan, Jones would remain in the car and Moore would enter the animal hospital and tie up and blindfold the doctor so that Jones could enter the building and access the money without the doctor recognizing him.  (Id. 438:18-25; 472:20-473:4).

Scott further testified that while en route to the animal hospital, Jones, who was driving Moore's vehicle, parked on a side street, so that Moore could exit the vehicle and retrieve a briefcase containing two handguns and adhesive tape from the trunk.  (Id. 440:8-23; 447:8-19; 469:20-470:2).  He also accessed an automatic gun from a compartment under the ashtray in the driver's side door of the vehicle.  (Id. at 440:25-441:1; 470:3-8).  Moore kept one handgun, gave the second handgun and the tape to Scott, and gave the automatic weapon to Jones.  (Id. 441:3-6; 447:8-19;

8

470:9). Jones then parked "not too far" from the animal hospital, and Moore said, "[c]ome on, let's get this over with." (Id. at 442:24-443:10).

Scott testified that he and Moore entered through the main entrance of the building which led to an unoccupied reception area. (Id. 443:17-444:10). A door slid open, and they were greeted by the doctor; Moore said, "we hit a dog." (Id. 444:17-21). The doctor instructed them to bring the dog in and slid the door shut. (Id. 445:5-7). Scott testified that Moore pulled his gun out of his pants, cocked it, slid the door back, and walked in the room, and that Scott followed him. (Id. 445:5-12; 474:16-17; 475:21-476:2). Moore ordered the doctor, Mr. and Ms. Romanchick, and the doctor's aide to the floor. (Id. 445:9-12; 445:22-446:23; 477:10-11). Scott testified that he handed his gun to Moore and taped the doctor's hands and feet and, per the plan, he put a sweater over the doctor's face to prevent him from recognizing Jones. (Id. 447:1-448:14; 450:24-451:2; 481:15-19). He then began to tape the aide when he heard "bang, bang, click" and looked up and saw Mr. Romanchick falling to the floor. (Id. 448:25-449:13; 482:8-11; 483:10-12). Scott testified that he did not have a gun in his hand at the time Mr. Romanchick was shot and that Moore possessed both handguns. (Id. 450:12-16). Moore uttered "you move, you die," snatched Ms. Romanchick's purse from the examination table, and ran out of the building. (Id. 450:3-11; 451:14-452:10; 482:24-25; 483:15-17). Scott stated that when Moore reached the vehicle, he said to Jones, "why did you lead me on a wild goose chase, like that there. He said, I probably done plucked a guy back there, or burnt him or

something of that nature." (Id. 453:2-5; 484:11-13). Jones responded "I'll get you out of here." (Id. 453:13; 484:10-11).

According to Scott, Jones drove him and Moore to Kenneth "Zip" McGoy's ("McGoy") home. (Id. 453:15-16; 483:21-25). A "girl" answered the door and resisted their entry. (Id. 454:18-19). Jones pushed his way in and walked to the bottom of the staircase and said, "[h]ey, Zip, your brother's here." (Id. 454:18-23). McGoy came to the top of the stairway and invited them upstairs. (Id. 454:22-23). Once upstairs, they all proceeded to a back room he described as a den area and began "rifling the purse." (Id. 454:23-455:9-10). They split the money three ways, but Jones gave $25 to McGoy "to get rid of the pocketbook." (Id. 455:23-456:2).

Scott went into the bathroom and completely shaved off his beard. (Id. 456:22-457:3). When he exited the bathroom, Jones, Moore, and McGoy were gone from the residence. (Id. 456:25-457:5). At approximately 11:30 p.m. or 12:00 a.m., Jones called McGoy's home and asked Scott if he saw the news, to which Scott replied "no." (Id. 457:17-22). Jones, Moore, and McGoy returned about thirty minutes later, at which time all four of them left the home and went to a club identified by other witnesses as Club Lee. (Id. 458:1-18; 604:10-605:12). They returned to McGoy's home around 2:30 a.m. or 3:00 a.m. (Id. 458:1-18). Jones, Moore, McGoy, and Scott departed the next morning between 7:00 a.m. and 8:00 a.m. (Id. 458:15-459:1).

Scott, who is now deceased, later stated in an affidavit that he had been coerced by the prosecution to testify against Moore and recanted his trial testimony.  (Petr.'s Hrg. Ex. 4; Doc. 96-1 at 9).

        2.        <u>Juanita Lancaster</u>

"In an FBI interview, McGoy's girlfriend, Juanita Lancaster, said that she had been with McGoy and her sister, Sarah, at McGoy's home on the night of October 1.  She said that three individuals arrived at McGoy's home, discarded clothing and items from Ms. Romanchick's purse, and left the next morning.  She identified two of the visitors as Anthony Jones and 'Rick.'  Based on photos . . . she identified Jones, McGoy, and Scott, but not Moore, as the men at McGoy's house." <u>Moore</u>, 457 F. App'x at 173.

At trial, Lancaster testified consistently with the information that she provided to the FBI during her interview.  (Trial Tr., 384:22-385:7; 386:3-6; 395:2-397:5).  She also testified that the individual she knew as "Rick" later became known to her as Ricardo Scott, that the third person was introduced to her as "Karim," and that she was never introduced to a "Tyrone Moore."  (<u>Id.</u> 386:5-6; 389:19-390:2; 391:14-392:4; 407:20-408:5).  During the trial, she identified Moore as the individual introduced to her as "Karim" on October 1.  (<u>Id.</u> 390:5-14).

Lancaster passed away in 1990.  (Petr.'s Hrg. Ex. 7 ¶ 3; Ex. 23 ¶ 1).

        3.        <u>Ms. Romanchick</u>

Approximately one week after the incident, police met with Ms. Romanchick at Nesbitt Memorial Hospital and presented her with a photo array of potential

suspects.  (Trial Tr. 377:20-24).  She identified a man, in two separate photos, as one

of the suspects present at the animal hospital; she was later informed his name was

Tyrone Moore.  (Id. 377:20-379:10; 380:18-381:2).  At a later, unspecified time, she

was shown photos by defense counsel and, although she again picked out two

pictures, one of the photos was not Moore.  (Id. 381:24-382:7).

　　　While on the witness stand, Ms. Romanchick described Moore as "five foot

six or seven to five foot nine, a hundred forty, a hundred sixty pounds, dark

complected, with small ears, short-cropped Afro, mean eyes, a nose that was wide

at the base and is [sic] eyes, his eyes stood out because when I walk [sic] to

somebody I usually look in the eyes and he had very mean looking eyes.  His nose

was wide, not at the top but like at the base and he had like a full jaw, his cheeks

were full, they weren't sunken in."  (Id. 343:4-12).  She identified him in the

courtroom and testified that her identification was based on her view of him "when

he first came into the room [at the animal hospital] and he motioned for us to get

down on the floor and when he was standing over my husband . . . " which, "in

total," was maybe a "minute, minute and a half."  (Id. 343:11-14; 361:16-21).  Ms.

Romanchick's description bore discrepancies from Moore's actual appearance.

Moore, 457 F. App'x at 174.

　　　　　4.　　Robert Brunson

　　　The Commonwealth also introduced Brunson as a rebuttal witness, to

establish that Moore was in the Wilkes-Barre area on October 1.  Brunson testified

that he had known Jones, Moore, and McGoy for years, that he had been in their

company "hundreds" of times, and that they were all outside Club Lee on the night of October 1.  (Trial Tr. 602:17-603:17; 605:17-22).  He recalled that Jones and Moore were together in front of the club and McGoy was across the street in a parking lot.  (Id. 605:2-13).  He also recalled that he had a three to five minute conversation with Moore, who he knew to be a boxer, about upcoming fights in the area.  (Id. 606:1-12).  He testified that Moore was known as "Karim."  (Id. 606:19-21).  Brunson denied knowing Scott and was therefore unable to place him at Club Lee.  (Id. 606:17-18; 607:17-23).

**B.    The Defense's Case**

1.    Tyrone Moore

Moore took the stand in his own defense and testified that in October 1982, he lived at 1025 South Frazier Street in Southwest Philadelphia, Pennsylvania.  (Trial Tr. 568:17-22; 569:16-21).  He also worked in Philadelphia, but was laid off at the time.  (Id. 570:13-16).  He reported owning two vehicles, a Regency and a 1979 Oldsmobile.  (Id. 578:13-14).  At the end of September 1982, he placed a plate on the front of the 1979 Oldsmobile bearing the phrase "Karim," which, according to Moore, is an Arabic word meaning generous.  (Id. 579:8-15; 584:15-585:7; 588:1-6; 590:16-19).

On October 1, 1982, Moore awoke at his Philadelphia home at approximately 11:30 a.m. and had a routine afternoon with his wife.  (Id. 571:1-7).  He left his home around 4:30 p.m. and traveled forty-five minutes in his 1979 Oldsmobile to the Joe Frazier Gym, located in Northwest Philadelphia, for a scheduled amateur boxing

training match.  (Id. 571:8-573:13; 584:12-20).  He did not meet with or speak to anyone on his way to the gym.  (Id. 571:19-21).  He departed the gym at approximately 7:50 p.m. and went directly home.  (Id. 574:10-19).  His evening included sitting on the porch with his wife, walking several blocks to a restaurant for a steak sandwich, returning back home to sit on the porch, and then retiring for the evening.  (Id. 575:2-576:2).  On October 2, 1982, he awoke at approximately 5:30 a.m. and, as was his routine, ran between five and seven miles and then went to the Joe Frazier Gym where he stayed until around 2:00 p.m. or 2:15 p.m.  (Id. at 576:14-577:15).

Moore testified that on October 1 and October 2, 1982, he had no occasion to leave the Philadelphia area, that he did not travel to the Wilkes-Barre area or the Forty Fort Animal Hospital, and that he did not lend his car to anyone.  (Id. 577:16-21; 578:22-25; 582:4-22; 588:13-18).  He did not know Scott and, to his knowledge, Scott had never been to his home.  (Id. 579:23-580:11; 588:23-25; 591:22-23).  He also denied meeting or knowing McCoy and stated that McCoy was never in his company or his home.  (Id. 582:17-19; 588:18-22).  He did not know Lancaster, and he was not introduced to Lancaster as "Karim" on October 1.  (Id. 581:19-21; 593:6-25).  Moore had never been known as "Karim" by anyone, including his friends in Philadelphia, nor was he known by "Buzzy" or any other nickname.  (Id. at 579:16-20; 590:12-15).  Although he had known Jones for approximately four years, he testified that he was not in his company on October 1 or October 2, 1982.  (Id. at 589:1-25.)

14

2.   <u>Kenneth McGoy</u>

McGoy testified that on the evening of October 1, 1982, Jones, Scott, and a third male (whose name McGoy could not recall) visited him at his Wilkes-Barre apartment between 8:30 p.m. and 9:00 p.m.  (Trial Tr. 520:24-522:3; 534:18-19).  In the privacy of a spare bedroom, Jones stated that "my boy just robbed this joint or something to that effect."  (<u>Id.</u> 537:17-539:15).  According to McGoy, Scott reported that their plan to rob a place was "foiled" in that "they went in, him and his friends, and they tied the people up, put them in one room and that as he was holding the guns on the one guy he jumped or moved and he shot him, twice" in the back.  (<u>Id.</u> 525:13-526:6; 542:15-16).  McGoy recalled seeing a purse and money that he believed came from the robbery but denied receiving any money.  (<u>Id.</u> 543-A:3-4; 545:10-23).  After about forty minutes, Jones, McGoy, and the third individual left the home, but Scott remained behind "because the lady saw him."  (<u>Id.</u> 528:6-19).  They eventually returned to McGoy's home, retrieved Scott, and proceeded to Club Lee, where they remained until it closed.  (<u>Id.</u> 533:9-534:13).  McGoy admitted to dumping the contents of the purse down a drain three days later.  (<u>Id.</u> 557:3-24; 559:7-22).

Based on the exchange that took place at his apartment, McGoy believed that Scott was the shooter and that Jones was not present at the robbery and did not know the third individual.  (<u>Id.</u> 539:14-15; 559:24-560:25; 562:9-12).  When counsel pointed out Moore in the courtroom, McGoy indicated that he was "absolutely sure" that Moore was not at his house on October 1.  (<u>Id.</u> 531:18-532:2).

## II.   Standard of Review

The evidentiary hearing provided Moore with an opportunity to move beyond establishing a *prima facie* case and prove his asserted entitlement to habeas relief.  In remanding the ineffective assistance of counsel claims, the Third Circuit noted that the state court had reached its decision by applying "an outcome determinative standard: that Moore had 'fai[ed] to demonstrate the result at trial would have differed but for counsel's performance.'"  Moore, 657 F. App'x at 182-83 (citing Commonwealth v. Moore, 860 A.2d 88, 96 (Pa. 2004)).  The panel concluded that the state court's decision was contrary to and an unreasonable application of the Strickland test and that Moore's allegations made out a *prima facie* case of ineffective assistance of counsel.  See id. (citing Schriro v. Landrigan, 550 U.S. 465, 474 (2007); Williams v. Taylor, 529 U.S. 362, 405-06 (2000)).  District courts review such determinations *de novo*.  See Breakiron v. Horn, 652 F. 3d 126, 138 (3d Cir. 2011); see also Panetti v. Quarterman, 551 U.S. 930, 953 (2007) ("When a state court's adjudication of a claim is dependent on an antecedent unreasonable application of federal law, the requirement set forth in § 2254(d) is satisfied . . . [and the court] must then resolve the claim without the deference AEDPA otherwise requires."); Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (*en banc*) ("It is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering *de novo* the constitutional issues raised.").

III.   **Discussion**

A habeas petition based on alleged ineffective assistance of counsel is governed by the two-pronged inquiry set forth by the United States Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To prevail on the claim, a movant must demonstrate that: (1) counsel's performance was constitutionally deficient and (2) counsel's deficiency prejudiced the movant.  Strickland, 466 U.S. at 687-88.

With respect to the claim concerning co-defendant Jones, the Third Circuit focused on Jones' affidavit, executed on November 25, 1997, wherein Jones states that Scott never mentioned that Moore was involved in the robbery and homicide but that a man named Emmet Burgis[4]—not Moore—was involved.  Moore, 457 F. App'x at 182-83.  Based on this affidavit, the Circuit found as follows: first, that Moore made out a *prima facie* case that his counsel's performance was deficient for failing to call Jones because Jones' testimony would have directly contradicted the prosecution's key witness and, second, that Moore was prejudiced by this deficiency because there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. (quoting Strickland, 466 U.S. at 694).

The Third Circuit also found "that counsel was unreasonable for failing to fully impeach Scott based on his deal with the prosecution and his prior

---

[4] Emmet Burgis is spelled inconsistently in the state court record, affidavits, and the May 2014 hearing transcript.  In this memorandum, the court will utilize the spelling employed by the Third Circuit—Emmet Burgis—unless directly quoted from the record.

convictions.  Scott was one of three key witnesses in the case, and therefore reasonable counsel would have fully undermined his credibility by introducing the reduction of his prison exposure from 60 to 20 years and the reduced charge from first to third-degree murder."  Id. at 182.

### A.    Deficient Performance

To prevail on his habeas petition, Moore must demonstrate that trial counsel's performance was "so inadequate" that they were "not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment."  Strickland, 466 U.S. at 687.  The Strickland test is exacting, and there is a strong presumption that trial counsel's performance was adequate and that counsel exercised reasonable professional judgment in making all significant decisions.  Burt v. Titlow, — U.S. —, —, 134 S. Ct. 10, 17 (2013) (quoting Strickland, 466 U.S. at 690).  Overcoming Strickland deference, which presumes that a challenged decision might have been sound trial strategy, requires a petitioner to demonstrate either that "the suggested strategy, even if sound, was not in fact motivating counsel" or that "the actions could never be considered part of a sound strategy."  Thomas v. Varner, 428 F.3d 491, 499 (3d Cir. 2005).  Even when a petitioner submits evidence that counsel's performance was in some manner deficient, the stringent first prong of Strickland still requires the petitioner to establish that counsel's error was so egregious as to fall "outside the wide range of professionally competent assistance."  Strickland, 466 U.S. at 690.  This test tasks the district court to assess "counsel's reasonableness

18

. . . on the facts of the particular case, viewed as of the time of counsel's conduct."

Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005).

Both of Moore's trial counsel, Attorneys Flannery and Yeager, testified at the evidentiary hearing on May 1 and May 2, 2014.  Unfortunately, Attorney Flannery, who Attorney Yeager identified as lead defense counsel, struggled to recall anything beyond the fact that he and Attorney Yeager represented Moore.  (Hrg. Tr. 8:25-9:4; 105:21-109:5).  It was not clear whether his memory was clouded by the passage of time, age, or medical condition.  Suffice it to say that Attorney Flannery's failure of recollection was palpable and genuine, and he simply was unable to shed any light on strategic decisions made before or during Moore's trial.  Consequently, the burden fell wholly on Attorney Yeager to identify the defense strategy.  Attorney Yeager testified, in pertinent part, as follows:

> Q. Okay. And do you recall -- just moving to your defense, what was the core of your defense in this case?
>
> A. The core of our defense -- Mr. Moore's defense was he was not present at the hospital, that he was, in fact, in Philadelphia at Joe Frasier's gym which is what caused us to have [our defense investigator] Russ Thomas visit the gym, interview Willie Rush, review any type of documentation that could be found with Mr. Moore's name or some type of entry evidencing the fact that on that date and time it would have been impossible for him to be in Luzerne County if he was, in fact, in the Philadelphia gym.
>
> * * *
>
> Q. And was part of that -- you had mentioned earlier that [Ricardo Scott] had a deal in exchange for his testimony. Was part of that also to draw the jury's attention to that deal and his motivation?

A. Absolutely. He would certainly have a definite interest in the manner in which he testified for the Commonwealth and how he handled cross examination. You take the death penalty of first degree off the table and you go down do [sic] third, that's a big difference.

(Hrg. Tr. 11:24-12:22; 20:4-12).

Attorney Yeager recalled the key evidence thusly:

Q. So just -- do you recall -- I know it's a long time ago. But we have talked a little bit before this -- do you recall the main evidence in the case against Mr. Moore?

A. Ricardo Scott.

Q. And he was one of the main I. D. witnesses; is that correct?

A. He was not only the main I. D. witness, he was the individual who placed the firearm in Mr. Moore's hand and also indicated that it was Mr. Moore and not him that fired the shot that ultimately Mr. Romanchick had passed away from.

Q. And is it fair to say, in fact, he was the only witness who was able to, in fact, put the gun in Mr. Moore's hands and say Mr. Moore was the shooter?

A. I believe so. I don't know that Mrs. Romanchick did. She may have identified him as being an individual at the veterinary hospital that day, but my recollection is Ricardo Scott was the primary and the focal witness of the Commonwealth.

Q. Okay. And do you also remember the issue of Mr. Moore's name purportedly being Kareem being an important issue in the prosecution's case?

> A. I do.  And I still recall -- I think there was an exhibit
> that was a picture of an automobile with the vanity plate
> Kareem on that vehicle that was probably introduced.

(Id. 11:24-12-22).

## 1.    Failure to Call Brad Jones

Ineffective assistance of counsel claims grounded in an alleged failure to call

an important, exculpatory witness demand an additional layer of deference to trial

counsel's strategy: the court need not give trial counsel the full benefit of the doubt,

but must "affirmatively entertain the range of possible 'reasons [trial counsel] may

have had for proceeding as they did.'" Cullen v. Pinholster, — U.S. —, —, 131 S. Ct.

1388, 1407 (2011) (citing Strickland, 466 U.S. at 692; Pinholster v. Ayers, 590 F.3d

651, 673 (9th Cir. 2009)).  The intersection of Strickland and the AEDPA thus

compels the court to exercise "double deference" when assessing such claims,

giving "both the state court and the defense attorney the benefit of the doubt."

Burt, 134 S. Ct. at 13 (quoting Pinholster, 131 S. Ct. at 1403).

Establishing a claim of ineffectiveness for failure to call a witness under

Pennsylvania law requires proof of: (1) the existence and availability of the witness;

(2) counsel's awareness of or duty to know of the witness; (3) the witness's ability

and willingness to cooperate and appear on behalf of the defendant; and (4) the

necessity of the proposed testimony in order to avoid prejudice.  Commonwealth v.

Hall, 701 A.2d 190 (Pa. 1997).  In the matter *sub judice*, each of these elements is

satisfied.  Jones was an available, willing, cooperative, and important exculpatory

witness.  Further, the trial testimony of Scott and Lancaster detailed above, as well

as the testimony elicited from defense counsel during the evidentiary hearing,

establishes that Jones' proposed testimony clearly was necessary to avoid prejudice.

Counsel's actions in identifying Jones as a material witness, and summoning Jones

to the courthouse to testify on Moore's behalf, confirms that counsel had knowledge

of Jones.

As demonstrated by Attorney Yeager's testimony, assessing *thirty years*

*later* the "range of possible reasons" for defense counsel's failure to call Jones is

problematic.  The content of the courthouse conversation between Jones and

defense counsel is unknowable.  What was, perhaps, logical is now inscrutable.

> Q.  Do you recall filing a petition for writ of habeas corpus to have Mr. Jones brought down from Lewisburg at the time [of] Mr. Moore's first trial?
>
> A.  I don't recall, but apparently there was one filed. I think Mr. Flannery had dictated it or whatever, but he was brought down.
>
> Q.  Okay.  I just -- so you -- so you do recall he was brought down?
>
> A.  Yes.
>
> Q.  I know you've already told us he's been brought down but -- and you recall that.  But referring you to Defense Exhibit 14, is that a copy of the actual bring-down request?
>
> A.  Yes, it's a copy of our petition for writ of habeas corpus that must have been signed by the secretary on my behalf because that's not my signature and then the Court order, that is Judge Podcasy's signature directing Mr. Jones be transported.

Q. Do you recall that Mr. Moore was adamant about having this particular witness, Mr. Brad Jones, called to testify in his behalf?

A. Well, it must have been at his insistence that we brought him down.  He wanted him there.

Q. Okay.

A. Okay.  And we wouldn't petition unless Mr. Moore had been consulted -- you know, certainly wouldn't bring a witness in that he didn't feel would be helpful.

Q. If the record indicates that Mr. Jones was never called to testify at the first or second trial, do you have any recollection of a strategic reason why that wasn't done?

A. The fact that after the interview of Mr. Jones -- if we felt his testimony was not going to be helpful to Mr. Moore or if he was not going to testify in a manner in which Mr. Moore led us to believe he would have, then we would not have called him as a witness.

Q. And these are your -- do you have a specific recollection of a reason why you did not call him?

A. I recall that we were allowed to visit with him out of the presence of the Court and the jury, Attorney Flannery and myself. I don't know if Russ Thomas was there. I don't believe that the meeting occurred -- it wasn't a very long conference. I don't recall. I don't recall if Mr. Jones had any legal counsel present because as it turned out he was also represented by the public defender's office when his case came to trial.  There was no conflicting his case out or what have you back then.  So the conversation was brief. I would have to say that based on what he was either going to testify or not testify to that's why he wasn't called.

Q.   And you're assuming that based upon the circumstances, is that fair to say?

A. Yes.

Q. Not based upon a specific recollection of anything Mr. Jones told you?

A. You know, that was 32 years ago -- 30 years ago. But I mean that -- that was my first homicide, so there's a lot I remember especially with respect to the mistrial and stuff. So I do recall Jones being brought down as I indicated. There was a short conversation.  I think it was primarily between Attorney Flannery and Brad Jones because Pat was the lead counsel. And it wasn't a long one, but as a result of that, he wasn't called.

Q. If the record indicates that you spoke to him for about five minutes that day, Brad Jones, would that be consistent with your recollection?

A. Five, ten minutes, yeah. I think that's accurate.

Q. Do you recall any interviews prior to that when he was at Lewisburg?

A. No.

Q. Do you recall any additional interviews after the mistrial and prior to the second trial?

A. No.

* * *

Q. Do you recall ever speaking to Mr. Moore about -- at the trial specifically about whether or not to [sic] Mr. Brad Jones was going to be called?

A. We would have had to speak to Mr. Moore at some point because then the petition was filed, and he was brought down.  But you have to understand that second trial Mr. Moore filed the petition for new counsel with respect to irreconcilable differences, and we joined in. There was a communication problem between Mr. Moore and the defense team.  So was there a lot of conversation or [were] we getting along, no, we weren't.  So it wasn't a free flow of information and exchanges, and it was -- we should have been left out as counsel in my opinion.  But the Court ruled.

24

> We didn't file an appeal or seek any other remedy.  So we
> were there to represent him.

(Hrg. Tr. 58:13-61:8).  With respect to whether trial counsel adequately addressed

and considered Jones' potential testimony, Attorney Yeager provided a candid self-

assessment, including a compelling recollection of inadequate witness investigation

and preparation.  He testified:

> Q. In your opinion, is five to ten minutes which you testified
> to -- that you and Mr. Flannery spoke to Jones, is
> that sufficient to get out the essence of a witness'[s] story?

> A.  Depends on what they tell you.

> Q.  That's fair.

> A.  If they say, no, I'm not testifying or, you know, no, I'm
> not going to say that, is it a very short time, yeah? And in a
> homicide case, yeah, you expect more time to be granted to
> you.

> Q.  If this interview occurred in the middle of trial, in fact,
> just prior to the defense witnesses being presented, would
> that even provide you the opportunity to investigate
> anything Mr. Jones might have told you during that five --

> THE COURT: I'm going to ask you stop leading at this point.
> Those are directly leading questions.

> Q.  Given those circumstances that you had five or ten
> minutes to speak with him, what investigation could you
> have done?

> A.  You are not going to do much investigation in five to ten
> minutes.  If the Court had granted -- I guess the -- the five to
> ten minutes is a problem.  The bigger problem is the fact
> that I know that I did not interview Mr. Jones before he was
> brought up from Lewisburg. I don't believe -- Attorney
> Flannery could verify this or testify to this -- I don't believe
> he spoke to Mr. Jones. And if Russ Thomas did, he would

> have informed us of the nature of what Mr. Jones would or
> would not have testified to. *So the fact that we brought him
> up as a witness and failed to properly and thoroughly
> interview him was wrong. That was just -- I can't explain
> why that wasn't done. But it should have been done especially
> with our client facing the charge that he did and that he was.*

(Id. 65:5- 66:11 (emphasis added)).  It is patently unreasonable for defense counsel to

fail to introduce evidence that contradicts a key prosecution witness's testimony.

See Berryman v. Morton, 100 F.3d 1089, 1098 (3d Cir. 1996).  Attorney Yeager's

concession that the defense failed to properly and thoroughly interview Jones—a

potentially critical exculpatory witness who would have squarely contradicted

testimony of the key Commonwealth witness—establishes that counsel's decision

not to call Jones is not the kind of strategic choice entitled to Strickland deference.

See Thomas, 428 F.3d at 499–500.  The court therefore concludes that, in light of all

the circumstances, counsel's failure to call Jones was so egregious that it falls

"outside  the wide range of professionally competent assistance" and is therefore

deemed deficient.  Strickland, 466 U.S. at 689-90.

> 2.    Failure to Impeach Ricardo Scott

As a general rule, courts defer cross-examination strategies to the sound

professional discretion of trial counsel.  See Jackson v. Bradshaw, 681 F.3d 753, 765

(6th Cir. 2012); Henderson v. Norris, 118 F.3d 1283, 1287 (8th Cir. 1997); see also

United States v. Orr, 636 F.3d 944, 952 (8th Cir. 2011).  Impeachment decisions are

considered "tactical" decisions and as such will not be considered deficient conduct

simply because better options existed.  See Reynoso v. Giubino, 462 F.3d 1099, 1133

26

(9th Cir. 2006).  However, when a witness has motivation to lie and to offer testimony favorable to the prosecution in exchange for favorable treatment, that fact "establishes the potential bias that would [constitute] compelling impeachment evidence" because such information would benefit a jury assessing the witness's reliability.  Grant v. Lockett, 709 F.3d 224, 236 (3d Cir. 2003).  Nonetheless, trial counsel's approach to impeachment will not be deemed ineffective unless the movant overcomes Strickland's presumption that the tactic might be considered sound defense strategy.  Strickland, 466 U.S. at 689.

The trial transcript reveals that in cross-examining Scott, defense counsel did not explore the issue of his plea agreement, the federal charges he was facing, and the motion for modification of his federal sentence based on his anticipated cooperation at Moore's retrial.  When questioned about this approach, Attorney Yeager testified:

> Q.  Have you reviewed the cross examination of Ricardo Scott prior to today?
>
> A.  No, because I believe Attorney Flannery did the cross examination of Ricardo Scott.
>
> Q.  Would it have in your opinion have been helpful to the defense strategy on the whole to establish on cross examination that prior to this deal that he received he was facing a life sentence and possibly death if he was convicted of murder one?
>
> A.  Yeah, I believe that I indicated that earlier, yes.
>
> Q.  And along those same lines, you probably stated this earlier, so I apologize for asking again . But if you -- would it have been helpful and consistent with the defense strategy to cross-examine him about the fact he received a

40-year sentence -- he could have received a much more extensive sentence for a murder-three conviction than he actually got?

A.  Yes.

Q.  And why do you think this information -- both the information we just discussed would have important?

A.  It would have been important because you are going, No. 1, from the death penalty, you're taking first and second degree off the table, third degree, he which [sic] could have gotten a 10 to 20, he's now facing a five-year.   It's non-consecutive or in addition to a federal sentence. It's concurrent.  So he's serving it basically at the same time. It's a great deal.

Q.  Were you aware of any strategic reason consistent with Tyrone Moore's defense why he was not questioned about these particular issues?

A.  No, Attorney Flannery -- he was the senior attorney at that time.  He did cross examination.  He didn't question why[,] he didn't ask anything that was -- that was his decision.

\* \* \*

Q. Still on the topic of Ricardo Scott, I think you mentioned earlier you were aware that he had [a] number a federal bank robberies that he was implicated in at the time of Mr. Moore's trial?

A. Yes.

Q. And showing you what's been previously marked as Defense Exhibit 11, can you identify what that purports to be for the record?   You can start with page one.

A. It purports to be the government's memorandum of a plea agreement reached between the United States of America against Ricardo Charles Scott.

Q. What's on the first page of that?

28

A. This is a letter dated May 24th, 1983, addressed to Russ Thomas, investigator to the Luzerne County Public Defender's Office regarding the negotiated plea agreements with respect to Mr. Scott and the federal cases.

Q. What's the date on that letter?

A. May 24th, 1983.

Q. So would it be fair to say you had this letter at the time of Mr. Tyrone Moore's retrial in September of 1983?

A. Yes.

Q. And would it also be fair to say that what prompted Mr. Thomas to obtain this was yours and Mr. Flannery's request?

A. Yes.

Q. What does the letter, if anything, say about a motion to -- for a reduction of sentence?

A. It indicates that Mr. Scott is currently sentenced to a 20-year -- 20 years of federal custody although a motion to [r]educe sentence may be considered following Mr. Scott's cooperation.

Q. Referring you to what's been previously marked as Defense Exhibit 12, can you take a minute and review that and identify what it purports to be for the record?

A. Purports to be a motion for modification of sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure filed in the third district -- I'm sorry -- the Eastern District of Pennsylvania on August the 18th, 1983.

Q. This was in that same case for Ricardo Scott -- United States of America versus Ricardo Scott?

A. Yes.

Q. Once again, this document was filed prior to Mr. Moore's retrial, correct?

A. Yes, it was.

Q. Can I refer you just to Paragraph 3 A. if you can take a minute to read that?

A. Yes.

Q. Would you agree that that paragraph indicates that one of the grounds for the motion was Scott's -- Ricardo Scott's cooperation in the prosecution of Tyrone Moore?

A. Yes.

Q. And can you identify what is attached to this motion?

A. It's a letter on the stationary of the District Attorney's Office of Luzerne County signed by Joseph Albert, who was the assistant district attorney, prosecutor of Mr. Moore. The letter is dated August 12th of 1983 directed to Mr. Miller of the Defender's Association of Philadelphia indicating that - - confirming that Mr. Scott fulfilled the requirements of his plea agreement, he would be needed for testimonial purposes in the case of Commonwealth versus Tyrone Moore and contemporaneous with that trial Mr. Scott will be sentenced.  It indicates he's done everything that's -- that has been asked of him and that Mr. Scott is expected to continue to cooperate with the Commonwealth.

Q. Would you agree that the letter once again shows that Scott's cooperation -- Mr. Ricardo Scott's cooperation in Mr. Moore's prosecution is being used in an effort to get a reduction in Mr. Scott's federal sentence?

A. In his federal?

Q. Yes.

A. Yes -- well, it certainly confirms that he's cooperated and fulfilled what he's supposed to do with the Luzerne County District Attorney's Office. . . .

* * *

> Q. Getting back to the federal motion for modification of sentence, if there was no cross examination of Mr. Scott and the record reflects that with regard to this federal motion for modification of sentence or the attached letter from Mr. Albert, do you know of any strategic reason why that wasn't done?
>
> A. I don't know of no [sic] strategic reason why that wasn't explored and fully cross-examined with respect to Mr. Scott, no.
>
> Q. Why would the defense have wanted to use this document?
>
> A. This document would have been important once again to show his bias and his motivation for testifying and his credibility.

(Hrg. Tr. 45:13-46:17; 47:2-49:23; 50:25-51:8).

Attorney Yeager concedes that he knows of no strategic reason for the failure to fully explore Scott's state and federal plea agreements—and his potential motivation to testify in a manner favorable to the prosecution—during cross-examination.  (See id.)  Quite frankly, the court is also unable to conjure any reasonable justification for the failure of defense counsel to introduce this important impeachment evidence.  Accordingly, defense counsel's omission is so egregious as to fall "outside the wide range of professionally competent assistance" and is therefore deemed deficient.  Strickland, 466 U.S. at 689-90.

31

### B.    Prejudice

The Third Circuit Court of Appeals describes the second <u>Strickland</u> prong as follows:

> To show prejudice, <u>Strickland</u> requires a petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694, 104 S.Ct. 2052. This requires more than just a "conceivable" likelihood of a different result. <u>Harrington</u>, 131 S.Ct. at 792. However, a petitioner "need not show that counsel's deficient performance 'more likely than not altered the outcome of the case'—rather he must show only 'a probability sufficient to undermine confidence in the outcome.'" <u>Jacobs v. Horn</u>, 395 F.3d 92, 105 (3d Cir. 2005) (quoting <u>Strickland</u>, 466 U.S. at 693–94, 104 S.Ct. 2052). Moreover, "[t]he effect of counsel's inadequate performance must be evaluated in light of the totality of the evidence at trial: 'a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.'" <u>Rolan v. Vaughn</u>, 445 F.3d 671, 682 (3d Cir. 2006) (quoting United States v. Gray, 878 F.2d 702, 710–11 (3d Cir. 1989) (quoting <u>Strickland</u>, 466 U.S. at 696, 104 S.Ct. 2052)).

<u>Grant v. Lockett</u>, 709 F.3d 224, 235 (3d Cir. 2013). The court must therefore determine, in light of the totality of the evidence, whether there is a reasonable probability that counsel's errors in failing to present Jones as a witness and failing to impeach Scott sufficiently undermines confidence in the outcome of Moore's trial.

Jones passed away on August 20, 2003. (Doc. 96-1 at 23). Documentary evidence introduced at the hearing included Jones' May 13, 1984, trial testimony, his November 15, 1985, statement given to Attorney Joseph Cosgrove during the state court proceedings, and his affidavit dated November 25, 1997. (Petr.'s Hrg. Exs. 15-

17).  Moore's present counsel and Attorney Yeager engaged in the following

exchange concerning the substance of that testimony:

> Q.  Referring you to what's been previously marked as Defense Exhibit 15, just looking at the first few pages, would you agree that that is the notes of testimony from Brad Jones' own trial in this homicide -- with regard to this Forty Fort homicide/murder?
>
> A.  Yes.

* * *

> Q.  If I can refer you to Page 625 and 626 where . . . Brad Jones testified that he was in Wilkes-Barre on the night of the robbery murder and that Scott was with Emmitt Burgess who he knew by the nickname Kareem  and not Tyrone Moore, would that have been information that you would have wanted to present at Mr. Moore's trial?
>
> A.  Yes, the name Emmitt Burgess never came up in Mr. Moore's trial[] discovery.
>
> Q.  Would you -- so that would have been information you would have wanted to use?
>
> A.  Had it been available, sure, because if Mr. Burgess was also referred to as Kareem --
>
> Q.  If those notes -- these notes of testimony of Brad Jones' testimony after his own trial do not at all implicate Tyrone Moore anywhere in this -- in this murder robbery, would you have found that useful?
>
> A.  Yes, and had he told us or made us aware of this when we had our brief interview with him, I would assume we would have called him as a witness. I don't recall him during that -- I don't recall that name Emmitt Burgess ever being mentioned by Mr. Brad Jones in that brief conversation that we had.

* * *

33

Q.  Referring to a document that's been marked previously as Defense Exhibit 16.  Does that appear to be a sworn statement given by Brad Jones in the courthouse on November 15th, 1985?

A.  That's what it appears to be, yes.

Q.  And have you had a chance to review this?

A.  Yes.

Q.  And does Brad Jones at all implicate Tyrone Moore in that sworn statement?

A.  This statement was given November 15, 1985, some two years after our trial. No, he does not implicate Mr. Moore.

Q.  And finally, I will refer you to what's been previously marked as Defense Exhibit 17.  Does that appear to be a signed declaration of Brad Jones?

A.  Yes, dated November 25th, 1997, 14 years after the trial.

Q.  Have you had an opportunity to review that?

A.  I believe you may have shown it to me when we -- prior to today, yes.

Q.  And does it implicate Tyrone Moore at all in this murder robbery, does that declaration?

A.  Could you repeat that question again.

Q.  Would -- does it -- does this declaration -- if you recall or if you can review it at all implicate Tyrone Moore in this robbery murder?

A.  No, it doesn't.

Q.  Referring you to Paragraph 4 specifically if you could review that and tell me if that's information had you known it that you would have wanted to present at Tyrone Moore's trial.

34

A. If he would have made that statement back in 1983, I don't see any reason why we wouldn't put him on the stand and have him testify. I don't have any recollection that Mr. Brad Jones in 1983 ever indicated that Ricardo Scott told him that he shot Nicholas Romanchick, that ever mentioned Emmitt Burgess as being Kareem.

Q. Assuming you had known the context of the contents of Mr. Jones' sworn statement given on November 15th, 1985, would you have wanted to use that? That's Exhibit 16. I apologize.

A. Yes, had he told us that, we would have -- I would think we had an obligation and duty to call him as a witness for Tyrone Moore. He clearly -- if he said that, we would have called him. If he said what he said in 1997, we would have called him. There's no -- I mean, maybe I don't recollect word for word. But I know he never informed us that Ricardo Scott was the shooter or that Emmitt Burgess was -- that name was anywhere mentioned or involved with this case.

(Hrg. Tr. 63:13-65:2; 66:11-68:4).

In his trial testimony, statement, and affidavit, Jones consistently maintains that he and Moore were not involved in the Forty Fort robbery and homicide. In fact, the story as told by Jones, in large part, completely contradicts the version given by Scott at Moore's trial. For example, at his trial, Jones testified that on October 1, he traveled alone by bus from Philadelphia to Wilkes-Barre, as opposed to being a passenger or driver in a car with Scott and Moore. (Petr.'s Hrg. Ex. 15 620:21-622:4). Jones testified that he encountered Scott and Karim, whose actual name is "Emmet Burgis," at Club Lee, and that Scott indicated that he and Karim were in need of a "place to lay" because he had just "plucked" or shot someone. (Id. 625:20-626:19). Scott, on the other hand, testified that Jones and Moore were his

partners in crime and that Moore was the shooter.  Jones also testified that he did

not plan the robbery, was not at the animal hospital on that day, did not take part in

the distribution of any weapons, did not act as a lookout man, and did not suggest

they go inside and rob the doctor.  (Id. 630:9-631:2).  Conversely, Scott testified that

Jones was the mastermind who suggested robbing the veterinarian, directed them

to the animal hospital, and waited in the parked car outside while he and Moore

entered the animal hospital.  Jones testified that he offered to take Scott and Karim

to McGoy's apartment and that they left Club Lee and traveled to the  apartment in

Scott's "brown caddy."  (Id. 628:2-12).  Scott, however, testified that Jones drove

Moore's 1979 Oldsmobile from the scene of the crime to McGoy's apartment.  Jones'

version of the events also calls into question Lancaster's testimony that the "Karim"

to whom she was introduced was Moore and not Emmet Burgis.

Equally compelling are the similarities that surface when one compares the

testimony of Jones and McGoy.  Jones testified that Scott identified himself as the

shooter.  (Id. 627:10).  McGoy also testified that when they were in the spare

bedroom in his home, Jones stated "my boy," who McGoy understood to be Scott,

just committed a robbery.  And McGoy testified that Scott reported that their plan to

rob a place was "foiled" in that "they went in, him and his friends, and they tied the

people up, put them in one room and that as he was holding the guns on the one guy

he jumped or moved and he shot him, twice" in the back.  (Id. 525:13-526:6; 542:15-

16).  Jones testified that initially, Scott would not leave McGoy's house with him,

McGoy, and Karim because he did not want to be seen until they "found out what's

up." (Id. 629:7-22).  McGoy testified that he left his apartment with Jones and the

third individual, but Scott remained behind "because the lady saw him."  (Id. 528:6-

19).  Consistent with Jones' testimony, McGoy believed that Scott was the shooter

and that Jones was not present at the robbery.  Jones denied that Moore had any

involvement in the events of October 1.  (Hrg. Ex. 16 3:1).  At Moore's trial, when

defense counsel pointed out Moore in the courtroom, McGoy indicated that he was

"absolutely sure" that Moore was not the individual who was at his house on

October 1.  (Id. 531:18-532:2).

Careful consideration of the totality of the evidence at Moore's trial leaves the

court with no doubt that, had trial counsel performed at an objectively reasonable

standard, and had Jones been called to testify on Moore's behalf, it is reasonably

probable that "the result of the proceeding would have been different."  Strickland,

466 U.S. at 694.

The court finds the same with regard to defense counsel's failure to impeach

Scott, whose extensive trial testimony was the critical component of the

prosecution's case.  Scott admitted intimate involvement in the robbery and fully

implicated Moore.  Scott was also the sole witness to testify concerning Moore's

participation in concocting the plan to rob the animal hospital, and he explicitly

described Moore's role in the execution of the robbery.  Scott placed two guns in

Moore's hands and identified Moore as Mr. Romanchick's shooter.  He also detailed

Moore's movements and whereabouts in the hours after they fled the scene.  As

aptly noted by Moore's counsel, Scott had strong motivation to lie and to testify

37

favorably to the prosecution in the hope of receiving favorable treatment from the

Commonwealth.  (Doc. 106 at 21 (citing <u>Grant</u>, 709 F.3d at 236)).  Counsel's failure to

properly and effectively impeach Scott is glaringly unreasonable when his testimony

is measured against the totality of evidence at trial and juxtaposed with the

testimony offered by McGoy and Moore, and the proffered testimony of Jones.

Defense counsel's failure to take advantage of what would have been forceful

impeachment evidence prejudiced Moore such that the court cannot but conclude

that, had counsel performed reasonably and effectively, there is a reasonable

probability that the result of Moore's retrial would have been different.  <u>See</u>

<u>Strickland</u>, 466 U.S. at 694.

## IV.   <u>Conclusion</u>

For the foregoing reasons, the court finds that the performance of Moore's

trial counsel was constitutionally deficient for failing to present Jones as a defense

witness to contradict the Commonwealth's case and for failing to impeach Scott.

The court further finds that these deficiencies prejudiced Moore so substantially as

to greatly undermine the court's confidence in the state court verdict.  Accordingly,

the court will issue a writ of habeas corpus pursuant to 28 U.S.C. § 2254 directing the

Commonwealth of Pennsylvania to retry Moore within ninety (90) days or to provide

for his release.[5]


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania


Dated:      August 26, 2014

---

[5] Although such a conclusion has far reaching consequences in light of the fact that Moore has spent more than thirty years in prison for his role in the Forty Fort robbery and homicide, the court emphasizes that nothing contained in this memorandum should be construed as an assessment of guilt or innocence. To the contrary, such an assessment lies solely with the jury on retrial of the state charges at issue. Further, the court is fully aware of the challenges facing the parties in the event of a retrial considering the significant passage of time and the fact that Scott, Lancaster, and Jones are now deceased. Nonetheless, justice compels the conclusions set forth herein.